REIBER, C.J.
¶ 1. Following a jury trial, defendant appeals his convictions for simple assault and disorderly conduct stemming from a late-night brawl in downtown Burlington. First, he argues that the court abused its discretion and denied him his rights to present a defense, to compulsory process, and to due process when it denied his motion to continue the trial despite the unavailability of a key witness due to her hospitalization. Second, defendant argues that the court erred by not declaring a mistrial when a prospective juror who had previously worked with defendant as his supervisor made negative comments about *581 defendant during jury selection. We reverse defendant's convictions and remand for a new trial on the basis that defendant was prejudiced by the inability to present testimony from the hospitalized witness. We do not reach the second issue of whether the court should have declared a mistrial due to the prospective juror's comments.
¶ 2. The following facts come from police affidavits, testimony from five witnesses, and video recordings from police body cameras and a surveillance camera. The brawl leading to defendant's convictions took place at about 3:00 a.m. on September 2, 2015, on the sidewalk outside of two bars on Main Street in Burlington-Esox and Nectar's. At trial, a Nectar's bouncer testified that defendant was also a Nectar's employee but that defendant had not been working that night. The bouncer further testified that defendant always wore glasses and rode a bike to work. Although the bouncer also knew the complainant as a patron of Nectar's and from mutual friends, he did not know if defendant and the complainant knew each other. As the bouncer helped load equipment into a truck for a band that had performed at Nectar's, he saw defendant and the complainant having a "close conversation," and although he "couldn't hear any words ... you wouldn't think that something was about to happen until it happened." The bouncer testified that he "didn't see what started the fight." He merely saw the outbreak of the fight out of his "peripheral vision" and then "turned and saw what was happening." At that point, the bouncer saw defendant and the complainant go "down to the ground" and then "other people around them ... stepped in ... to try to separate them."
¶ 3. At trial, an Esox patron largely corroborated key elements of the bouncer's testimony and further gave insight into what precipitated the brawl. After testifying that he knew defendant because "[h]e works at different establishments that I have frequented," the patron testified that he saw defendant "leaned against the wall" outside Esox and "some words were ensued" between defendant and the complainant. He described this conversation as "angry," "cussing," and "loud." At that point "a fight broke out" and the patron "saw both of them on the ground fighting."
¶ 4. Responding to the commotion, Burlington Police Department officers stationed at the intersection of Church Street and Main Street ran toward the crowd that had gathered around defendant and the complainant. They arrived on the scene as the men were brought to their feet by intervening spectators. Two of these officers-Officers Harnett and Drinkwine-testified at trial. Officer Hartnett was wearing a body camera and turned it on as he ran toward the crowd; the recording from this body camera was introduced at trial. He testified that as he arrived at the scene, "[t]here was a large crowd of people" and defendant "was in front" of him. He testified that he saw defendant then attack and injure the complainant:
He starts walking around, and then he approached the victim and put his hands around that-around the victim's throat. And I watched him slam that male to the ground causing a head injury. And then Officer Drinkwine and myself put hands on [defendant] and took him off, and placed him in handcuffs. ... And from what I recall, [the complainant] hit his head on the metal grate, and there was injuries to the back of his head, and blood going around his face and neck.
¶ 5. The two officers arrested defendant. Officer Drinkwine testified to the same, describing defendant's attack on the complainant as a "choke slam" and describing *582 that he saw defendant "grab with both of his hands around [the complainant's] neck, and slam him to the ground." At that point, the two officers pulled defendant off complainant and arrested defendant, and Officer Hartnett escorted defendant to a nearby police car. Officer Drinkwine stayed with the complainant, whom he described as being "unconscious for several seconds ... upwards of twenty to thirty seconds, before he regained consciousness."
¶ 6. The complainant testified at trial and said that after drinking some beer at Esox and then leaving the bar, his memory became uncertain: "Leaving is the only thing I do remember from there. I remember walking outside. After that I just remember gaining consciousness in an ambulance." He "sustained a complex concussion, with two lacerations to the back of [his] head," requiring staples.
¶ 7. In addition to the police body camera, the events of the night were captured on surveillance video from Esox. Due to an awning, the beginning of the recording only shows the parties from the knees down. It does not show how the fight began.
¶ 8. A key takeaway from these five witnesses' testimony is that no witness saw who initiated the fight or saw what immediately precipitated the fight. Officer Hartnett's body camera footage and the Esox surveillance camera footage likewise do not reveal the moments immediately before the two were fighting. But one person who was at the scene may have seen the entire incident from start to finish-the witness who was unavailable for trial due to her hospitalization, whom we identify as R.C. At some point after defendant was arrested, R.C. recounted the events she witnessed to another officer at the scene. Some of what she described was recorded on his body camera.
¶ 9. The first twenty seconds of the recording are silent. They show R.C. walking past some people gathered on the sidewalk and approaching Officer Leclerc. R.C. and Officer Leclerc then begin to converse away from the crowd, although, again, the first portion of this conversation is silent. The audio suddenly begins as R.C. is in mid-sentence, describing the event as a "drunken misunderstanding." She describes two men talking, with a bike between them. She says the complainant started the fight: the "guy that was passed out, the guy that was knocked out was the guy who attacked the guy with the glasses." R.C. stated that defendant thought that the complainant was trying to steal his bike, while the complainant thought that defendant was "starting a fight." The recording concluded after R.C. swore to the officer that everything she said was true.
¶ 10. The State charged defendant with simple assault and disorderly conduct. The matter proceeded to jury selection and trial in January 2016.
¶ 11. The issue we address on appeal arose immediately following jury selection. Defendant filed a motion to continue the trial when he became aware that witness R.C., whom the defense had subpoenaed to testify at defendant's trial, was "unavailable for trial due to sickness or disability." Defendant did so pursuant to Vermont Rule of Criminal Procedure 50(c)(3), which reads:
A party shall not be entitled to a continuance on the ground of the absence of a material witness whom it is in the power of such party to summon, except when such witness is sick or otherwise disabled from attending court, unless he or she shall have caused such witness to be regularly summoned to attend.
*583 (Emphasis added.) The motion included an affidavit from defense counsel explaining that just after jury selection, R.C. called defense counsel and explained that she had been admitted to the Brattleboro Retreat, would not be able to testify at trial, and was upset about the situation because she felt what she had to say was "important." The affidavit further explained that R.C. signed a release to allow defense counsel to communicate with her care providers at the Retreat.
¶ 12. The affidavit went on to explain the following sequence of events. After speaking with R.C., defense counsel contacted the State to advise it of the situation. The State responded that it was willing to meet with defense counsel and the court to discuss the situation, but the court was unavailable at that time. Defense counsel requested a meeting with the court at its earliest convenience to discuss the matter. On the morning before trial, the State and defense counsel met with the court to discuss the situation. Defense counsel moved to continue the trial until R.C. was available to testify. The court pointed out that there was a proper way to request a continuance, laid out by Rule 50. It required a motion supported by an affidavit from a physician. The court proceeded to inquire as to the importance of R.C.'s testimony, as the court was under the impression that there were multiple witnesses. Defense counsel stressed that R.C. was the only witness who could give the specific testimony she was expected to give.
¶ 13. The State objected to the motion to continue. The State agreed that, had these events transpired before jury selection, defendant would have had a strong case for continuance. However, the case had already been delayed, and the complainant had a vested interest in the case proceeding on schedule. The State acknowledged that R.C. was expected to make "favorable statements for the defense." The court determined that without more than hearsay evidence from defense counsel, it could not continue the trial. That same afternoon defense counsel filed a formal motion for continuance with an affidavit and supporting document attached; the affidavit was from the Chittenden County Office of the Public Defender, and the attached document was entitled "Verification of Inpatient Hospitalization." Both were dated January 26, 2016.
¶ 14. The affidavit stated that, based on the statement R.C. gave to police the night of the incident, she was expected to testify that the incident was a "drunken misunderstanding" and that the complainant had attacked defendant. The affidavit also detailed defense counsel's efforts to contact R.C.'s treating physician to obtain an affidavit about R.C.'s medical inability to comply with her subpoena. When defense counsel was unable to contact R.C.'s treating physician, a clinical mental health counselor at the Brattleboro Retreat faxed paperwork detailing R.C.'s diagnosis, the seriousness of her condition, and her expected discharge date. The faxed paperwork included an unnotarized affidavit from the mental health counselor stating, in part, that if R.C. completed the medically managed withdrawal program, she would be discharged on February 2, 2016, and that she would "be able to attend trial and give testimony after that date." Defense counsel also submitted this paperwork to the court.
¶ 15. The court denied the motion to continue. The morning of the trial, it acknowledged that defendant was "in a bit of a spot that he didn't create," and defense counsel "did everything reasonably available to her in terms of effort and production" to meet the requirements of Rule 50. But the court nevertheless cited the lack of the required physician's affidavit as the *584 primary reason for denying the motion. The court also expressed concern that granting the motion could be futile because R.C. could still be unable to testify at a later trial due to her mental health issues and the prospect of testifying could worsen her anxiety. The court acknowledged the possibility that this decision may be prejudicial to defendant, but it noted that it had the opportunity to protect against potential error by allowing the body camera video of R.C. speaking with Officer Leclerc into evidence at trial.
¶ 16. At trial, the jury heard the testimony of the Nectar's bouncer, the Esox patron, the complainant, and the two responding Burlington Police Department officers. The jury also watched the Esox surveillance camera footage and Officer Harnett's body camera footage that included part of R.C.'s statement to Officer Leclerc as recorded by his body camera, but did not hear from Officer Leclerc himself. Drawing attention to the significance of R.C.'s unavailability-and despite the admission of R.C.'s recorded statement-the State told the jury during closing arguments that there was "no evidence that [the complainant] ever hit anybody, or tried to hit anybody and missed. Not one witness said that." The State also pointed to the fact that the testimony of R.C. was not available for in-court testimony, without explaining why. The jury returned a guilty verdict on both counts.
¶ 17. Defendant appeals, arguing, in relevant part, that the court abused its discretion and denied him his rights to present a defense, to compulsory process, and to due process when it denied his motion to continue trial despite the unavailability of a key witness due to her hospitalization.
¶ 18. We review the court's denial of defendant's motion to continue for abuse of discretion. See Irving v. Agency of Transp., 172 Vt. 527, 528, 768 A.2d 1286, 1289 (2001) (mem.) ("[T]he decision to grant or deny a motion for a new trial is committed to the sound discretion of the trial court."). In doing so, we recognize that "[a]buse of discretion requires a showing that the trial court withheld its discretion entirely or that it was exercised for clearly untenable reasons or to a clearly untenable extent." State v. Mottolese, 2015 VT 81, ¶ 6, 199 Vt. 470, 124 A.3d 809 ; see State v. Schreiner, 2007 VT 138, ¶ 14, 183 Vt. 42, 944 A.2d 250 ("Because a motion to continue must be decided in the light of the circumstances surrounding each individual case, we will not interfere with the trial court's decision if there is a reasonable basis to support it."). We also recognize that, to reverse the trial court's decision, the abuse of discretion must have resulted in prejudice to the defendant. See State v. Kelly, 131 Vt. 582, 588, 312 A.2d 906, 909 (1973) ("Without a showing of prejudice, the burden of which is on appellant, error is not grounds for reversal."). We review the court's interpretation of Rule 50 de novo. Vt. All. of Nonprofit Orgs. v. City of Burlington, 2004 VT 57, ¶ 5, 177 Vt. 47, 857 A.2d 305.
¶ 19. The right to present a defense includes the right to offer witness testimony. See Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense ...."). Both the Sixth Amendment to the U.S. Constitution and Article 10 of the Vermont Constitution guarantee this right. See State v. Dragon, 130 Vt. 334, 335, 292 A.2d 826, 828 (1972) ("The right of an accused to obtain witnesses in his behalf is guaranteed by Amendment VI of the United States Constitution and Article 10 of the Vermont Constitution."). Section 6501 of Title 13 *585 implements this right: "On the trial of an information or indictment, the party accused may defend himself or herself, be heard by counsel, produce witnesses and proofs in his or her favor, and shall be confronted with the witnesses produced against him or her." 13 V.S.A. § 6501 (emphasis added).
¶ 20. Continuance is an important means of protecting the right to present a defense. "That a person charged with crime is entitled to a reasonable opportunity to procure and present the witnesses necessary to his defence, including a postponement of the trial, if need be, is elementary." State v. Pierce, 88 Vt. 277, 280, 92 A. 218, 219 (1914). In Pierce, a key witness who had been summoned to appear at the defendant's trial but was unable to attend because of a severe winter storm would have contradicted the State's evidence with testimony that no other witness could have provided. We held that when a "motion for a continuance discloses the absence of a witness, the materiality of his testimony, that it cannot otherwise be supplied, and facts disclosing reasonable diligence to procure his attendance, it is error to deny the motion." Id. We stated further that the motion should be granted if there was nothing to indicate bad faith on the defendant's part. Id.
¶ 21. Rule 50(c) dictates the proper procedure for the request and grant of a continuance, and its interpretation must be made in the context of the right to present a defense. Of particular relevance to this case, that section requires that any motion to continue due to the illness of a witness be accompanied by a physician's affidavit:
Motions for continuance shall be accompanied by an affidavit stating the reason therefor and the time when such reason was first known. If the motion is founded on the absence of a witness, the affidavit shall state the name and place of residence of the witness; the substance of the testimony which he or she is expected to give, and the grounds for such expectation; and the measures taken to procure his or her attendance or deposition, to the end that the court may judge whether due diligence has been used for that purpose. If it is claimed that the witness is unable to attend court by reason of sickness, an affidavit of a reputable physician will be required, stating the disease, and the measure and character of the disability, and the probability of the witness being able to attend at a future term.
V.R.Cr.P. 50(c)(1) (emphasis added).
¶ 22. Here, defense counsel did not provide a physician's affidavit regarding R.C.'s hospitalization as required by Rule 50(c)(1), and this was the primary reason why the court denied the motion to continue: "The Court confirms [its earlier ruling], because Defendant never filed an affidavit from a physician or psychiatrist confirming that [R.C.] was unavailable." The questions for this Court are whether it was within the court's discretion to grant a continuance absent a physician's affidavit and whether the court abused its discretion by not granting the continuance.
¶ 23. We answer both questions in the affirmative. The purpose of Rule 50's affidavit requirement is to ensure to the court that a witness who claims to be too ill to attend trial is in fact unable to attend. See Reporter's Notes, V.R.Cr.P. 50, 1982 Amendment ("The court may refuse to grant a continuance where it finds the continuance would not be 'in the interests of justice.' "). Indeed, Rule 50 states that the affidavit must specify "the measures taken to procure his or her attendance or deposition, to the end that the court may judge whether due diligence has been used for that purpose." V.R.Cr.P. 50(c)(1) (emphasis added).
*586 ¶ 24. Our resolution of a similar issue in a previous case is instructive. In State v. Jones, the State orally requested a continuance for a police officer witness who was on leave. 157 Vt. 553, 601 A.2d 502 (1991). After questioning the need for the witness and not receiving a satisfactory response, the court declined to continue the trial. On appeal, we rejected the State's argument that the trial court's failure to generally enforce the affidavit requirement precluded its enforcement in that particular case. We noted that the trial court had not relied on the State's failure to abide by the affidavit requirement, but rather had "obtained much of the needed information from representations of the deputy state's attorney." Id. at 556, 601 A.2d at 503. We stated that "[w]hile the trial court may often rely on representations of counsel in situations where there is no challenge to the factual assertions, it retains the right to insist on compliance with the affidavit requirement to resolve bona fide contests." Id. at 556 n.*, 601 A.2d at 503 n.*. Thus, in certain circumstances, the trial court has the discretion to focus on the underlying substance of the motion to continue rather than on a rigid or formalistic adherence to Rule 50's requirements. Id. We do not mean to imply that the affidavit requirement can be routinely ignored. A party does so at its own peril. But the trial court is not deprived of its discretion to grant a continuance absent a physician's affidavit when, as here, there is no challenge to the factual assertions regarding a witness's illness.
¶ 25. Here, although defendant did not provide a physician's affidavit, the information he did provide accomplished this purpose of showing that defendant's counsel exercised "due diligence" to "procure [R.C.'s] attendance." Indeed, he subpoenaed the witness before trial and, upon learning of the witness's unavailability, made every effort to obtain a physician's affidavit, ultimately settling for an unnotarized affidavit from a mental health counselor. The court indicated it was convinced of the legitimacy of R.C.'s illness: "[C]learly this woman is suffering both physically and from mental health issues that were substantial." Given these circumstances, the court should have accepted defense counsel's affidavit, which included the statement from the Retreat's counselor, in lieu of a physician's affidavit.
¶ 26. The court further erred by supporting its decision not to exercise discretion with its speculative belief that R.C.'s medical issues would leave her unable to attend even a delayed trial. The Retreat stated it expected that R.C. would be released on February 2, 2016. After referring to a court system that was too busy and too expensive to continue a trial at the last minute, the court expressed its unwillingness to continue this case when there was a risk that R.C. could be readmitted to the hospital shortly before a rescheduled trial. In doing so, it prioritized speed over defendant's right to present a defense. This insistence on speed, in the face of a justifiable request for continuance, violates both Amendment VI of the U.S. Constitution and Article 10 of the Vermont Constitution. Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) ("[A] myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.")
¶ 27. Moreover, this abuse of discretion resulted in prejudice to defendant. In determining whether prejudice existed as the result of the trial court's abuse of discretion in denying a continuance, we engage in a harmless-error analysis. See State v. Coney, 266 Conn. 787, 835 A.2d 977, 987 (2003) ("In the event that the trial court acted unreasonably in denying a continuance, *587 the reviewing court must also engage in harmless error analysis." (quotation omitted)). "For the error to be harmless [in a criminal proceeding], the reviewing court must find beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error." State v. Oscarson, 2004 VT 4, ¶ 30, 176 Vt. 176, 845 A.2d 337.
¶ 28. In this case, because the court instructed the jury on self-defense, R.C.'s testimony would have been vitally important to defendant. R.C. was the only witness expected to testify in support of defendant's self-defense argument. The State admitted to the court that R.C. was expected to make "favorable statements for the defense." Defense counsel therefore made a good-faith effort to bring R.C. to trial.
¶ 29. This prejudice was amplified by the twenty-second gap in Officer Leclerc's body camera recording of R.C.'s video statement and the State's closing assertion that there was no evidence that the complainant was the aggressor. The court attempted to prevent prejudice to defendant by allowing the jury to see the body camera video of R.C.'s initial statement to police on the basis that it was as good as a deposition because the officer asked R.C. to swear to the truth of her statement at the end of the recording. However, the court never tried to explain or correct the twenty seconds of silence at the beginning of the recording, so the recorded statement was not an adequate replacement for live testimony from R.C. Finally, defendant was further prejudiced by the State's closing statement that there was "no evidence that [the complainant] ever hit anybody, or tried to hit anybody and missed. Not one witness said that." This closing argument appears to discount the value of the recorded testimony given by R.C. and calls into question R.C.'s status as a witness.
¶ 30. The State contends that there was no prejudice because there was indisputable evidence that defendant was the unprovoked aggressor with respect to the second of two altercations between the complainant and defendant. We disagree. The State charged defendant with only one count of simple assault. The deputy state's attorney did not differentiate between the two altercations in its opening argument, but he stated to the jurors during closing argument that even if they had doubts about the first altercation, they should find defendant guilty of assault based on the second altercation.
¶ 31. Following the close of evidence, defense counsel sought a self-defense instruction. The state's attorney argued that a self-defense charge was unwarranted, given defendant's unprovoked assault during the second altercation. He acknowledged, however, that the first altercation was "part of the body of the crime." The trial court gave the self-defense instruction without differentiating between the two altercations, stating at the charge conference that the second altercation "certainly [could] be considered as a continuation of one incident, even though there was a [brief] separation in time of the physical alteration." R.C.'s recorded statement indicated that the complainant was the aggressor. It is not known precisely what additional information she would have provided to explain what happened between the complainant and defendant if she had not been incapacitated and unable to testify, but there was plainly potential for the jury to view the charge differently if they had heard in-court testimony from the only witness that could have provided that information.
¶ 32. Because we reverse and remand for a new trial on the basis that the court *588 erred by not granting defendant's motion to continue, we do not address defendant's second argument that the court erred by not declaring a mistrial when a prospective juror who had previously worked with defendant as his supervisor made negative comments about defendant during jury selection.
Reversed and remanded for new trial.